The next case, number 22-1101, Sarah Fraga v. Premium Retail Services, Inc. Mr. Keselenko, please introduce yourself on the record to begin. Good morning, Your Honors. Jonathan Keselenko for the Appellant Premium Retail Services. May it please the Court, I'd like to reserve two minutes for rebuttal. You may. Your Honor, this case involves whether retail merchandisers, such as plaintiff Sarah Fraga, are transportation workers under the Federal Arbitration Act. The Court found that they were, but in recognizing that they were and finding that they were, Judge Young found that this, that they, quote-unquote, skirted the boundaries of the Federal Arbitration Act exemption. We submit that he erred in so finding. Judge Young, very briefly, he did not find that there were any problems with the underlying contract itself. He found that the contract itself was binding, except for the FAA exception. I have three main points here, Your Honor. One is that retail merchandisers, such as Sarah Fraga, based on the nature of their job, are not transportation workers. The second main argument that I have is that the Supreme Court's decision this summer in Southwest v. Saxon, which Ms. Fraga's counsel argues essentially is a game-changer, we argue that that does not impact this case at all and does not provide an additional basis or a basis at all for affirming the district court's decision. And lastly, with your indulgence, time permitting, I'd like to get into the three-category test that this Court set out in the Wataka v. Amazon case. Why is it, this strikes me as, and I may be wrong, so sorry to put it up, but why isn't this a simple case where your client has a frequent need as part of its business to get certain materials to its ultimate customers, and the way it does is it ships them interstate to persons like the plaintiff and then relies on that person to drive them the last mile to the location? Your Honor, I would distinguish this case from a last-mile delivery driver such as the plaintiff in the Wataka case. The plaintiff's business model here, I mean, the defendant's business model here is that it is primarily engaged in retail merchandising. It contracts with retailers such as Wal-Mart. But primary isn't the test. The test is frequent under Southwest. Well, Your Honor, we don't dispute that from time to time the plaintiff receives packages. The record says almost every week. But, Your Honor, we believe that the test is to look to the nature of the person's job, and here the nature of the person's job is as a retail merchandiser. She spends, undisputed on the record, the vast majority. Right, but frequently rather than primary suggests that a job could be multifaceted. I could have several jobs. I do this, I do this, but I also make sure that the last mile is completed on getting the stuff from A to B. Your Honor, we submit that the Supreme Court did not intend to change the test in terms of It was dealing on a narrow basis with baggage handlers. It's cited to a case from 100 years ago that dealt with longshoremen. It was a narrow dispute. It expressly left open in the footnote the situation such as gig economy drivers, such as the plaintiff in Wataka using the Ninth Circuit case there as the example, and also grubhub type drivers. We believe that that court did not intend to change the fundamental test that this court laid out in the Cunningham v. Lift case that the Seventh Circuit spelled out in the Wallace v. Grubhub case that the SJC decided very frequently recently in the Archer v. Grubhub case. That what you focus on is the primary nature or the central nature, and you see courts using two different words, but essentially meaning the same thing, that you focus on their core responsibilities. It can't be that just because somebody crosses state lines on a frequent basis, and they happen to have merchandise with them, that that person is an interstate. Is it fair to say happened to? What's that? Is it fair to say happened to? You said happened to have merchandise. I don't think it's just happenstance that she has the merchandise. The whole idea of the way Judge Codd is asking you to address it is that that merchandise was delivered to her to deliver to the store. It's not like she just fell into her lap. Your Honor, we take issue, with all due respect, with the terminology deliver. It is somewhat happenstance that the material goes to her versus going to the store directly. The nature of her job doesn't change because premium retail decides. I guess all I meant by it is from the perspective of the party sending it, it wants it to get to the store. That's true. It makes a conscious decision to send it to her rather than to the store. That's true, Your Honor. And it can't get there unless she gets it there. Well, once they ship it to her, it certainly can't get there. And they chose to ship it to her. And they chose to ship it to her. So they're depending on her to get it to the store. In the instances in which they ship it to her. Which is frequently. Well. On this record. On this record, it happens on a weekly basis. Yeah, so if on a weekly basis you ship it to somebody on the understanding that they're the way that the stuff that you ship it to her to get it to the store will get to the store, it's a little hard to see why they're not depending on her to deliver it. Again, Your Honor, two points, if I may. One is we're accepting or I accepted before the district court their characterization of the frequency. We don't agree with that. We don't agree. But that's not an issue on appeal, correct? What's that? That's not an issue on appeal, correct? Well, the record, the entire record is before you, Your Honor. So you can do that. I usually just do what you argue about. What's that? I usually depend on you to tell me what you argue. I mean, there is a dispute. I don't understand your appeal to be challenging that finding. Our appeal is that we win even if you find that, even if you accept the plaintiff's argument that it occurred. Okay, so now we're just asking how come? Yeah, and the reason is, again, we take issue with the nature of her job. We believe that the transportation worker exception goes, you should examine the nature of what she's doing. Sure, and the nature of the job is that she frequently delivers these things. She does other stuff too, lots of other stuff. Say she does 12 things. I mean, is the nature of a second baseman's job to a bat? I'd say that's a primary basis. Is the nature to steal bases? Frequently. Just because you do other things doesn't mean that you don't frequently deliver, does it? If I may use an analogy here, say that you have a plumbing problem, for example, and let's just say that the plumber works for a national company like Roto-Rooter, and the person, the plumber goes to your house, diagnoses the problem. You don't know what it is. You just have a leaky faucet, and he or she tells you, you need a new part. You need a new part for your sink. You need a new faucet. It's happened to me recently. The plumber goes into his car or her car, takes out the faucet, puts a new faucet in. Now, maybe Roto-Rooter shipped that faucet from another state, and the plumber installed it in my house here in the Commonwealth. Does that mean that the plumber, the transportation worker, because the faucet gets delivered from out-of-state to the plumber, and maybe he's got a full truckload of faucets, and he diagnoses the problem as he sees fit. Well, in your example, when the out-of-state entity shipped the faucet to the plumber, they weren't trying to ship it to you. They were shipping it to the plumber, and then the plumber does with it what he or she may do with it. It's a little different than the out-of-state shipper wants to get it to you, and the way it gets it to you is, say, send a package to the plumber and say, please deliver this to you. Your Honor, the other thing that we believe distinguishes this from the last mile driver is that when Amazon puts something in a warehouse and gives it to a delivery driver, the sole purpose of the delivery driver is to deliver it to the house, whereas, again, our central argument goes back to the primary duty test, which we believe is this Court's standard in the Cunningham v. Bishop. Let me ask this. If we find the primary was first mentioned in Wykie, our earlier decision, it then gets quoted in Cunningham. It's there, it's infrequent, so it doesn't make a difference in the case, but anyhow, let me ask you this. If we were to find that the proper test is frequent rather than primary, are you left with a leg to stand on? Well, Your Honor, it depends on when you say frequent. There's no evidence in the record as to the frequency for which Ms. Fraga and the other class of workers cross state lines. I think what you're saying is this may not have been frequent, but my question is if we find that frequency is the test, then is that your only argument to argue this wasn't frequent? Your Honor, I still think that if, Your Honor, if the test is did they frequently cross state lines with the merchandise, I still believe that you need to look to the nature of the job. Well, the nature of the job involves frequently delivering stuff to the last mile. But the primary nature of the job, I don't mean to argue, Your Honor, but the primary nature of the job is is a retail merchandiser. I think you're saying you need to use the word primary test. Or central, like the Wallace Court does. I mean, if you go back to the Circuit City v. Adams case, I mean, that individual, the record there was not very well established, but that individual was a retail worker. And the court in Circuit City v. Adams was focused on the exception applying to transportation workers. That worker there didn't do any delivery. There's no evidence in the record one way or the other. Yes, that's correct, Your Honor. I mean, if you just imagine a strange hypothetical in which, for whatever reason, Circuit City decides it's like to deliver it to the salespeople at their houses. I wouldn't recommend it as a business practice, but if you did it and then depended on the salespeople to bring it into work and then sell it,  because they're really salespeople? Even though all of the material is shipped to them at home and it only gets to Circuit City to be sold if they bring it in? Your Honor, I believe that to be true because, again, the end goal here is not to transport the material to the... It clearly is. I mean, Circuit City sells nothing unless it gets to its stores. It just, for whatever reason, chooses to have the material first go to the people who are the salespeople. Maybe it's cheaper for them. But obviously their goal is to get it to the store and they're depending on these people to get it there. They're also depending on them once they get there to sell it. But that seems awfully strange to say they're not transportation workers just because they're doing double duty. Your Honor, we believe that the Hill case, which the 11th Circuit decided, is directly on point here. And that was a furniture salesman... I'm sorry, a furniture manager who the record established from time to time and there's not as much of a record in terms of the frequency, obviously predates the Saxon case, but delivered the materials to the person's house or people's house. That was one of many job duties. And the 11th Circuit found in Hill that that person was not a transportation worker because, again, focusing on what the reason was that the person was employed and that was as a furniture salesman. And we believe that that case is very instructive to this situation here where Ms. Fraga is primarily employed as a retail merchandiser. Thank you. Thank you. At this time, if Mr. Davis will please introduce himself on the record to begin. May it please the Court. May it please Your Honors. Joshua Davis, good morning. I'm here for Plaintiff Appley. And I do want to pick up a little bit where opposing counsel left off. The District Court made some instructive findings here on the frequency with which Ms. Fraga and other retail merchandisers delivered these goods to stores. And that is the Court found this was a core part of her job. So it isn't just incidental or ancillary. And, indeed, in regard to frequency, if one looks at the underlying record, the Court said that she did this not occasionally. In other words, the antonym of occasionally would be frequently. And that is at ADD 028. In addition, the underlying evidence establishes at the risk of building the lily slightly that in the declarations of various merchandisers, including not only Ms. Fraga, but several others or four others, they indicated that they received these goods at home and delivered them anywhere from several times a week to daily or almost daily, I think, was the limit. So this is a much higher number. Compare that to the facts of Saxon where the ramp supervisors who engaged in loading and unloading didn't. There's no finding by the Supreme Court in Saxon that it was their primary duty to engage in the relevant loading and unloading. What the Court actually said was they supervise and they train ramp workers who load and unload. And then they, and this is the language of the Court, step in or fill in up to three times a week. So the most frequency we see in Saxon is the lowest frequency we see on the record here. And so on that record, we think that although the Court didn't use the word frequently by saying not occasionally perform these tasks, the District Court was as close to prescient as one can reasonably be about the frequently standard that the Supreme Court articulated and satisfied it in its findings that the underlying record supports that as well. And I emphasize that because there is somewhat of a disagreement about the standard of review here. It's our position that the standard of review for the District Court's factual determinations is clear error, that we initially premium argued that it was de novo for everything and relying on Patton v. Johnson. In our opposition brief at page 23 and the footnote thereon, we explained that that was an oversimplification, that in fact in the First Circuit under opinions like Rivera-Colón in 2019 and also in Coulinane in 2018, that when factual issues, contested factual issues are resolved, it's clear error on a motion to arbitrate. And we think that is the standard that governs here. What's the record for the motion to compel arbitration that we're looking at? It's the complaint plus what? Unless there are a series of declarations. And those declarations are relevant to the record for purposes of making the findings that determine whether the exemption applies? Yes, because both, and premium concedes this in effect because plaintiffs submitted declarations that were specifically relevant to the motion to arbitrate, as did premium. So both sides submitted evidence. Both sides submitted evidence, relied on evidence in their arguments, both in the trial court and on appeal. And indeed, on appeal, premium has gone one step further. So what's the, based on all of it, the declarations, et cetera, what do you understand the district court's finding to be about how often this plaintiff receives the materials at home, with the expectation of delivering them? The underlying evidence provides a number. Ms. Fraga says two to three times a week, other retail merchandisers. Not what I asked. Yeah, so the only language that I'm aware of that the district court offered was it specifically said this was a core part of her job and that she was assigned this task, that is the delivery of the POP merchandise, the point of purchase merchandise, not occasionally. So I guess my question is, you know, words like core or frequency, I get a little worried that they may be mixed fact law questions, if they're the standard by which we determine whether you're a transportation worker. Whereas every day, every week, those would seem like fact questions for clear error. Right. And so I'm just trying to figure out on this record whether the district court is telling us that it's making a finding about how often in, you know, every day, brute fact terms, she was expected to do deliveries. Because not occasionally, I mean, I know you say the antonym is frequency, but a few times, is that not occasionally? A few times is not occasionally and would satisfy the standard in Saxon since it was up to three times a week. But what I would say is I do agree. So I'm just not sure we've got a finding here that we're quite supportive of. Sure. Here's what I would say. My apologies. Yeah, absolutely. And it's a difficult question, right, because this is part of the reason why Rule 882 is written as it is, allegations, not facts, because you can always reduce facts to further facts. But what I would say in regard to this particular finding is that it's important to keep in mind that the opinion was written before Saxon. And so there was no more reason to remand rather than to affirm. Well, I would say not. Well, here's why I'd say not, is there was no legal conclusion of frequency before the court. That's what I'm saying. If that's the key thing now, then wouldn't it be useful for the district court to make a finding about all the evidence that would then it would determine meets that test or doesn't meet that test? Two reasons I would say not. One is because there was not occasionally was only a factual determination, as was core, because those were not legal conclusions at the time. The court was using them in the ordinary factual meaning. Second, the decision whether to arbitrate or not is a preliminary procedural issue so the litigation can go forward. We're a year and a half in by the time this opinion comes down in all likelihood. If this court were to remand again rather than determine on a record which we think is more than sufficient to affirm, that would mean that we would have to have a second hearing covering the same ground. We'd maybe get a little bit more specificity in the ultimate district court's opinion. There would be an appeal as of right in another state in all likelihood. I take all that, but we can only do what we can do. But there's two components to that. One would be the conclusion that the record is just so clear that it compels the conclusion about how often she was expected to deliver these things, that as a legal matter it just meets the test of frequency. The other possibility is the district court made a finding on that, regardless of whether the record compelled that conclusion, and then we review it for clear error. What I'm hearing you say is that as to the second, the language you're hanging your hat on, that there was such a finding is the not occasionally language, right? In the alternative, what I would say is that the overwhelming evidence in the record, and I can cite to you exactly where it is in the record, is that these particular merchandisers, and there are five of them, and in the record we see it just so it's there, RA 032, paragraph 5, RA 042, paragraph 7. That's where Ms. Fraga says that she received these goods at home several times per week. We have Ms. Beach at SA 003, paragraph 7, where she says two to three times a week. Ms. Johnson at SA 009, paragraph 7, says almost daily. That's helpful. And then at the import of the footnote where the district court says at oral argument, your opponent didn't challenge those allegations, didn't dispute those allegations, even though it has a declaration saying generally we send it straight to the store. Yes. But then I guess the district court says at oral argument below, premiums counsel assumed the accuracy of Fraga's allegations, so those have never been challenged. Those have never been challenged? That's exactly right. And what I would say is on the waiver argument specifically, the court said, okay, let me just understand, you're taking this evidence, as plaintiffs put it forward, as opposing counsel just said today, and opposing counsel there said yes, and that's at RA 064. And then at the very end of the argument, which is not something cited in the district court's opinion, this is at ADD 007 footnote 3, the court says there's waiver. Later on at the close of the oral argument, lest there be any doubt, the court says, let me just understand this, I'm paraphrasing, but let me just understand this. We are to take the evidence as Ms. Fraga puts it forward and opposing counsel, and you say you win regardless, and opposing counsel says yes, that is correct. So I think the waiver issue, again, repeated here is very clear, and that means that this evidence, which consistently says it's at minimum two to three times a week and up to daily is enough, even if you were not to use the clear error standard, but to say, well, let's look at the factual record de novo. The uncontested factual record supports that there is no need to determine on frequency, again, keeping in mind that in Saxon, all the finding was that the RAMP supervisors who perform other tasks fill in or step in up to three times a week, which is a lower threshold than the several times a week to daily that the record here establishes. I would also point out on the primary issue, I disagree with opposing counsel about whether primary is still alive and well, and I think one key point there that's so important is that the Supreme Court in Saxon did not find that the primary task of the RAMP supervisors was to load and unload. The most it found was that they stepped in or filled in frequently, that is, up to three times a week. And so if opposing counsel were right, the primary was alive and well, Saxon was wrongly decided, or at least there wasn't a sufficient factual record for the conclusion the court reached. So that can't be the case. What I would add is that in cases that talk about central and primary, like Cunningham versus Lift, they're actually not talking about, for the most part, when they're talking about that, they're actually drawing a very different distinction than the one opposing counsel has raised. They are not emphasizing, they're not discussing primarily how is it that the worker spends his or her time. What they're talking about is what is the nature of this intrastate delivery of goods or people. Is it separate from the interstate delivery, or is it centrally or primarily about the interstate delivery? And this is a crucial distinction that has emerged in the case, though, that I don't think our brief teased out as clearly as it could, that overwhelmingly, certainly in the First Circuit and most other places, what courts are asking is, they say there's an easy case. When you have an integrated interstate journey, when you have a worker who's part of an effort that is an uninterrupted delivery from one customer ultimately to a point of delivery interstate in a different place, that is what this court here called an integrated interstate journey, what the court in Saxon and this court in Witaka called in the flow of interstate commerce. In those cases, it's easy, just relatively easy, to satisfy the in interstate commerce step of the analysis. Contrast that with either the Plummer example, opposing counsel Hughes-Teer, or Cunningham v. Lyft, where what the court was talking about centrally and primarily, what it was mostly saying is, no, no, no, these are activities. What Lyft does is interstate, and it begins and ends either before the interstate commerce, the drop-off at the airport, or after the interstate commerce, that is, after picking up somebody who's arrived at the airport. What the courts have said is, they're much more skeptical. It would be our opinion that that's not necessarily a loser, but it is at least a much easier case when the workers are part of the continuing flow of the goods, as were the workers here. Those goods were always intended to arrive at the stores where Ms. Braga and the other merchandisers delivered them. There was no separate intrastate role they were playing. Any separate intrastate role occurred after the destination were the retail stores. Therefore, even if Ms. Braga and the other merchandisers played a purely intrastate role in that uninterrupted flow, that integrated interstate journey of the goods or people, that was sufficient to fall within Saxon, to fall within the Amazon cases. Distinguish that from the harder cases, the Grubhub case, the Postmates case that is before this court. This distinction is not original to plaintiff here. This is the very distinction that Archer drew in Grubhub, saying cases like the Amazon case, those are different. That's uninterrupted interstate commerce, and we're on the right side of that. So how does that dichotomy you pose apply to the portion of the Cunningham plaintiffs who drove interstate sometimes? It's very important that what Cunningham held was we are not addressing whether there's an exemption under Section 1 for those drivers, those who themselves crossed state lines, to the extent they bring claims arising from that interstate journey. We withhold judgment, this court said. It's perfectly consistent there. It's that the vast majority was a separate intrastate travel. Therefore, that class isn't satisfied, but the question was left open. And I would point out here, to the extent it matters, the claims of Ms. Fraga and the other merchandisers arise from overwhelmingly, not purely, but arise from overwhelmingly their participation in interstate commerce. They weren't paid for their time packaging the goods, loading and unloading them, and delivering them. How does the furniture store case, the furniture salesman case, fit in with this discussion that you've just been having? Is that an after case rather than integrated journey case? Generally speaking. Is it not a frequency case? Or is it both? There are elements of both. To the extent that the furniture has arrived through interstate commerce at its ultimate destination, and then there's a separate travel that's intrastate, then that's the harder case. That's the Cunningham v. Liv case. To the extent that on rare occasion, somebody who deals in furniture happens to cross state lines with that, I think Cunningham leaves. Then it's a question of you can bring claims potentially if they arise from that particular activity, as Ms. Fraga does in part here. But otherwise, it becomes maybe a de minimis case or something like that. Thank you. Thank you very much, Your Honors. At this time, if Mr. Keselenko would reintroduce himself on the record and begin for his two-minute rebuttal. Thank you, Your Honors. Jonathan Keselenko, again, for the Appellant Premium Retail Services. Your Honors, if I could address specifically the issue that was raised in my opponent's argument regarding the record. It's worth noting here that the record in front of the district court was very thin. It essentially consisted of the complaint and a couple of different affidavits. So to the notion, and there was no live testimony, obviously. That can't help you since you brought the motion. Right. But, Your Honor, the notion that the district court made findings of fact based on It's a simple point, which is just you're the one making the motion to compel arbitration. That's correct. Yeah. And so if you have to show, I guess the burden is on them. The burden is on them. The burden of proof is on them. And our argument, and there were no concessions made, and there's no waiver, and Judge Young never found that there was a waiver. You filed your motion to dismiss, and you filed nothing with it, just one line, please dismiss, no evidence, no argument. You'd lose. Well, you need to carry the ball forward here to get some burdens shifted to them then. Well, the burden of proof under, in order to, the presumption is that the exception doesn't apply. So the burden of proof is on them in this case. But you've got to generate something to get it to them. You can't go file one of these motions one line long in every case filed in federal court and have someone to the test. Well, no, Your Honor, exactly right. We had the burden of proof of establishing that there was a binding contract between the plaintiff and my client, which we did as the district court found. And it's their burden to prove that the transportation worker exception applied. And my limited But here's what I don't understand. When you say it's thin, it might be, there's thin and then there's disputed or something like that. This is a number of, as far as I can tell, undisputed allegations about frequency with nothing on the other side. Well, that's not true, Your Honor. There is an affidavit from my client, Ms. Balkenbush, where she says that it occurred, I don't have the exact language in front of me right now, but it was essentially infrequently, that it was, again, I'm paraphrasing, that it was a rare event. Is that the general, is that her statement about how generally they did things or with respect to these five people? With respect to Ms. Fraga, the named plaintiff here. So there's just a dispute. You say the record just shows a dispute. The record just shows a dispute. And the district court does not purport to break that tie.  So what follows dispositionally for what we should do? I understand that you have this primary point, but just on this record point, what follows for what we should do then? Well, Your Honor, you could decide, if you believe that it's important to get more evidence on this, you can decide to remand for more findings of fact. That's what the Third Circuit did in the Singh v. Uber case. It's not seeking more evidence, necessarily. I just would like a... Evidentiary record, yes. So are you saying there is not a finding of fact of frequency? I don't believe that the district court made findings of fact. The district court was just reciting the facts, assuming them as true. But what about footnote three where it says you, that argument, assumed the accuracy of the allegations for purposes of the motion to dismiss? With all due respect to the district court, that's a misstatement of the record. Did you appeal that finding? We specifically noted in our appeal, yes, that that was inaccurate. We did specifically state, and we cited to the record, that the court misstated that. All we were saying below was even assuming the accuracy of Ms. Fraga's affidavit, we win. But we never assumed, we never accepted that as a finding of fact, by no means. And the record is clear about that. Our briefing is clear about that. Thank you. Thank you. That concludes argument in this case.